# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TONY JONES APPAREL, INC., <br> Plaintiff, <br><br> v. <br><br> INDIGO USA LLC, INDIGO USA LTD., <br> HAE KIM and JOHN DOES 1-5, <br> Defendants. | Case No. 03 C 0280 <br><br> Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

In Count III of its Complaint, plaintiff Tony Jones Apparel, Inc. ("Plaintiff") alleged that corporate defendants Indigo USA LLC and Indigo USA Ltd. ("the corporate defendants") and individual defendant Hae Kim ("Kim") engaged in trafficking in counterfeit goods with respect to their distribution of certain apparel bearing Plaintiff's trademarks. (Compl. ¶¶ 47-52.) [Dkt 1.] (Defendant Kim and the corporate defendants are collectively referred to as "Defendants.") Plaintiff seeks judgment against the corporate defendants and Kim individually. (*Id.* ¶¶ 7-11.) Plaintiff also seeks injunctive relief, damages, and attorney's fees. (*Id.* ¶ 1; Prayer for Relief ¶¶ E, F, G.)[1] The parties consented to the jurisdiction of a magistrate judge on May 26, 2004. [Dkt 43, 44.] For the reasons set forth below, judgment is entered for Plaintiff on its trafficking in counterfeit goods count

---

[1] Plaintiff's Complaint also alleged claims of federal and common law trademark infringement (Counts I and IV), federal and common law unfair competition (Counts II and V), and deceptive trade practices (Count VI). (Compl. ¶¶ 37-46, 53-63.) Plaintiff previously filed a motion for partial summary judgment on those counts, which was granted by the District Judge with respect to the corporate defendants, but no findings of liability were made with respect to the individual defendant. (Sept. 23, 2003 Mem. Op. & Order at 11.) [Dkt 32.] As will be explained below, Plaintiff is no longer seeking relief with respect to any of those counts; thus, the liability of the individual defendant regarding those counts is not at issue.

against the corporate defendants and against individual defendant Kim. Individual defendant Kim's liability is based on three separate theories, namely, vicarious liability, contributory liability, and piercing the corporate veil. Plaintiff is awarded statutory damages in the amount of $50,000 and its reasonable attorney's fees and costs jointly and severally against all Defendants.[2]

## **Background**

Prior to the reassignment of the case to this court, the parties submitted a draft final pretrial order to the District Judge. *See* dkt 36, 51. That draft order, which contained certain Stipulations of Uncontested Fact at Tab A, was signed by both Plaintiff's counsel and counsel then representing Defendants. (Final Pretrial Order.)[3] Subsequently, Defendants' counsel was granted leave to withdraw as counsel. [Dkt 50.] Defendants were given time to obtain new counsel [*id*], but no new attorney ever filed an appearance on their behalf.

Following reassignment, a pretrial conference was held on November 8, 2004, and a bench trial was held on November 15, 2004. [Dkt 48, 51, 53.] At the pretrial conference, no one appeared on behalf of Defendants, including individual defendant Kim. [Dkt 51.] The court found at the pretrial conference that the facts contained in the draft final pretrial order submitted to the District

---

[2] The Complaint filed on January 14, 2003 also referred to John Doe defendants 1 through 5. (Compl. ¶ 12.) However, the John Doe defendants apparently were never identified or served. Any attempt to name or serve them now would be untimely. *See* Fed. R. Civ. P. 4(m). Therefore, the failure of those John Doe defendants, who were never actual parties to the case, to consent does not defeat the jurisdiction of the magistrate judge. *See Williams v. General Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998) (stating that "the lack of consent of someone who is not a party to an action does not deprive the magistrate judge of jurisdiction").

[3] The draft final pretrial order was filed in open court on February 18, 2004 [dkt 36], but was never entered on the court docket. Thus, that document is being entered on the docket concurrently with this opinion.

Judge had been stipulated by the parties, and accepted the stipulated facts as proof in this case. [Dkt 51.][4] At Plaintiff's request, the court scheduled a rule to show cause hearing as to why default judgment should not be entered against the corporate defendants on all claims. [*Id.*]

At the time scheduled for the trial, Plaintiff's counsel appeared for the rule to show cause hearing and trial but, again, no one appeared on behalf of Defendants, including defendant Kim. (Tr. 3; dkt 53.)[5] Plaintiff's oral motion for default against all Defendants on all claims pursuant to Fed. R. Civ. P. 55(b)(2) was granted, and a bench trial proceeded. (Tr. 4, 5; dkt 53.) Even though a default order was entered, Plaintiff through its counsel presented evidence on the issues of liability as well as damages.[6]

The court has carefully considered the stipulations of uncontested fact in the parties' final pretrial order, the exhibits admitted into evidence, and the testimony of the sole witness, Stanley Sneeringer. (Final Pretrial Order; Tr. 8-14; Pl.'s Exs. 1-60.)[7] The court has also considered the District Judge's findings in his opinion granting partial summary judgment. (September 23, 2003

---

[4] Those facts are cited herein as "Stip. ¶ __." Prior to the trial, Plaintiff filed a revised Pretrial Order on November 1, 2004, which also contained a statement of uncontested facts. [Dtk 52.] However, because that Pretrial Order was not signed by anyone on behalf of the Defendants, the court has looked to the parties' original stipulations.

[5] Citations to the transcript of the trial on November 15, 2004 are cited herein as ("Tr. __.")

[6] *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, vol. 10A, § 2682, 18 (3d ed., West 1998) (stating that "if the trial proceeds in the absence of the defendant, the court should require plaintiff to present evidence supporting liability, as well as damages, and a judgment should be entered in plaintiff's favor only if the evidence supports it").

[7] At the trial, Plaintiff's Exhibits 1 through 60 were admitted into evidence. [Dkt 53; Tr. 5-6, 19, 25.] They will be cited herein as "Pl.'s Ex. __."

Mem. Op. & Order.) [Dkt 32.]⁸ The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton,* 474 U.S. 104, 113-14 (1985).

## Findings of Fact

### A. Plaintiff's Business and Trademarks

Plaintiff is a New Jersey corporation with its principal place of business in New Jersey. (Stip. ¶ 1.) Plaintiff owns federal Registration No. 2,243,323 for the trademark CLENCH, which was registered in the United States Patent and Trademark Office ("PTO") on May 4, 1999 for men's, women's and children's apparel, bags, eyeglasses, and sunglasses (collectively referred to as the "Clench goods"). (Stip. ¶¶ 8, 9.) In conjunction with the registered CLENCH mark, Plaintiff uses a CLENCH mark, a stylized version of the CLENCH mark, a lion's head logo ("Lion Head Logo"), a hang tag bearing the Lion Head Logo, and a distinctive tan and brown grid design. (Stip. ¶ 11.) All of those are referred to as "Plaintiff's trademarks." Plaintiff's Lion Head Logo, which was adopted in 1997, is distinctive as a trademark for Plaintiff's goods. (Stip. ¶¶ 62, 63, 65.) A photograph of Plaintiff's hang tag bearing the Lion's Head Logo is attached as Exhibit B to the Complaint.

Since at least 1997, Plaintiff has been in the business of advertising, marketing, offering for

---

⁸ The District Judge adopted this court's recommendation that Kim be barred from challenging or introducing any evidence inconsistent with or contrary to the findings in the September 23, 2003 opinion. (Order, May 13, 2004.) [Dkt 42.]

-4-

sale and selling Clench goods in interstate commerce to retailers and distributors at wholesale and through in-person and catalog sales throughout the United States. (Stip. ¶¶ 2, 7, 12, 15, 63.) Since 1996, Plaintiff has sold in excess of $45 million in Clench goods and spent over $1 million in advertising and other marketing costs associated with Clench goods. (Stip. ¶¶ 13, 14.) Eighty percent of those sales and advertising/marketing costs involve goods bearing Plaintiff's Lion Head Logo. (Stip. ¶ 64.)

### B. The Corporate Defendants and Individual Defendant Kim

Defendant Indigo USA Ltd. is an Illinois corporation with places of business in Chicago and Buffalo Grove, Illinois, and was engaged in the business of selling wholesale merchandise including men's apparel beginning in December 2000. (Stip. ¶¶ 4, 6, 31.) Indigo USA Ltd. is currently dissolved. (Pl.'s Ex. 58.) Defendant Indigo USA LLC has never engaged in business of any kind, but had a place of business in Chicago. (Stip. ¶¶ 29, 30.) Indigo USA LLC is presently defunct. (Pl.'s Ex. 59; Stip. ¶ 3.) Individual defendant Kim resides in Buffalo Grove, Illinois and was the sole shareholder/member, executive and officer of both corporate defendants at all times during their existence. (Stip. ¶¶ 5, 35, 37-39.) Kim carried out all substantive actions by the corporate defendants. (Stip. ¶ 43.)

### C. Defendants' Acts in Connection with the Men's Velour Track Suits

In September 2002, the corporate defendants purchased 2,040 sets of men's velour hooded tops and long pants (track suits) bearing marks virtually identical to or substantially indistinguishable from Plaintiff's trademarks, including the CLENCH mark. (Stip. ¶¶ 16, 20; Pl.'s Ex. 10 at Interrog.

No. 11.) Those sets are referred to as the "counterfeit goods." The corporate defendants purchased the counterfeit goods from S & L Trading in Seoul, Korea and imported them into the United States. (Stip. ¶ 17.) S & L Trading was not authorized by Plaintiff to sell any goods bearing Plaintiff's trademarks to any U.S. individual or entity other than Plaintiff. (Stip. ¶¶ 18, 19.) Defendants had not received consent from Plaintiff to purchase or resell those goods. (Stip. ¶¶ 18-19, 22-23, 71.)

In December 2002, the corporate defendants resold approximately eleven dozen of the counterfeit goods to three retailers for a combined total of $13,320. (Pl.'s Ex. 10 at Interrog. No. 12.)[9] It appears that each dozen was sold for a minimum of $720.00, or $60.00 per track suit. (Pl.'s Ex. 10 at Interrog. No. 12.) Defendants knew at the time they purchased, imported, and sold the counterfeit goods that those goods bore trademarks which were virtually indistinguishable from or identical to Plaintiff's trademarks, and knew that the trademarks belonged to Plaintiff. (Stip. ¶¶ 49-52, 60, 61.) Defendants had not performed a trademark search or sought the advice of counsel with respect to the trademarks on those goods. (Stip. ¶¶ 53, 54.) Defendants admit that the existence of Plaintiff's federal registration placed them on constructive notice of Plaintiff's rights in the mark. (Stip. ¶¶ 10, 42, 49-54.) Plaintiff first discovered Defendants' use of its CLENCH mark and other trademarks in or about December 2002 when a customer informed a representative of Plaintiff that potentially counterfeiting Clench goods were in the marketplace. (Stip. ¶ 21.) Plaintiff's executive director contacted the corporate defendants around that time and demanded that they cease the illegal distribution of the counterfeit goods. (Stip. ¶ 22.) After receiving no response, Plaintiff's counsel

---

[9] Specifically, seven dozen were sold to Fox Fashion (located in Danville, Georgia) for $8,820.00, one dozen were sold to Deep Fashion (located in Bollingbrook, Illinois) for $720.00, and three dozen were sold to Hamdies Fashion (location not provided) for $3,780.00. (Stip. ¶¶ 57-59; Tr. 8; Pl.'s Ex. 10 at Interrog. No. 12.)

sent a "cease and desist" letter to the corporate defendants on December 16, 2002. (Stip. ¶ 23.) The corporate defendants never responded to either of those communications. (Stip. ¶ 24.) Plaintiff filed this lawsuit suit on January 14, 2003. (Stip. ¶ 25.)

On April 29, 2003, pursuant to a Request for Permission to Enter onto the Premises of the corporate defendants, Plaintiff's attorney, Catherine Simmons-Gill, and Stanley Sneeringer, an attorney working as an independent contractor for Ms. Simmons-Gill, visited the corporate defendants' business premises. (Stip. ¶ 26; Tr. 9-10.) Mr. Sneeringer testified that at one of the warehouses, he observed a large number of boxes bearing the Tony Jones Apparel name. (Tr. 9, 10-11; Stip. ¶ 55.) Mr. Sneeringer stated that when they opened one of the boxes (which they did in defendant Kim's presence), they found velour track suits containing the stylized version of the CLENCH mark as well as a Lion Head Logo, although those goods had not been produced by or for Plaintiff. (Tr. 7, 11-12; Stip. ¶¶ 27, 56; Pl.'s Ex. 27, Photographs; Pl.'s Ex. 31, Track Suit & Packaging.) Mr. Sneeringer photographed and videotaped the velour track suits, and Plaintiff's counsel produced one of the suits at trial. (Stip. ¶¶ 27, 55; Tr. 7; Track Suit & Packaging.) The marks on the velour track suits were virtually identical to or substantially indistinguishable from Plaintiff's trademarks. (Stip. ¶¶ 16, 20; Pl.'s Exs. 3-8, 13, 14, 31.) Further, the track suits were packaged in plastic wrap containing the CLENCH mark and the Lion Head Logo, as well as the name "Tony Jones Apparel, Inc." (Tr. 7; Stip. ¶ 55; Photographs; Track Suit & Packaging.)[10]

---

[10] Mr. Sneeringer testified that at the Chicago warehouse, they also observed several faux leather jackets whose labels bore Lion Head Logos as well as the name "Indigo." (Tr. 9, 13; Stip. ¶¶ 66, 67.) Mr. Sneeringer estimated that there were about "40 or 50" boxes of those leather jackets in that facility. (Tr. 13-14.) He testified that between the two facilities, there were approximately 160 boxes bearing the name "Tony Jones Apparel." (Tr. 11, 12.)

## D. Evidence Regarding the Maintenance of Corporate Formalities

Since at least 2001, one or more of the Defendants maintained a checking account at Foster Bank in Chicago under the name, "Indigo U.S.A." (Stip. ¶¶ 44, 45.) Kim was the only signatory on that account. (Stip. ¶ 46.) Kim personally obtained funds belonging to, and said that he loaned money to, Indigo USA Ltd. without documenting or accounting for that activity. (Pl.'s Ex. 60, Hae Kim Dep. at 71-72, 74-75, 64-65, 67.) Kim wrote numerous checks to the order of "cash" out of the Foster Bank account. (Stip. ¶ 47) Neither he nor Indigo USA Ltd. could account for the funds received as a result of many of those checks. (Kim Dep. at 66-67, 71.) Kim wrote a check payable to himself, explaining at his deposition that the check was reimbursement for expenses on behalf of the corporation, but he did not provide any receipt or other documentation of the expenses. (*Id.* at 64.) Kim wrote at least one check for $1,500 on the account of Indigo USA Ltd. payable to his wife, although she did not work for Indigo USA Ltd. and there is no claim that Indigo USA Ltd. owed her money. (*Id.* at 70.) He testified that he took cash from Indigo USA to repay money he borrowed personally, and thought there "might be a record that has Indigo['s] name on it." (*Id.* at 71-72.) However, there was no documentation for those loans or any repayments. (*Id.*) Kim presented nothing to the court to contest, rebut, or explain any of this evidence.

## E. Relief Sought by Plaintiff

At trial, Plaintiff's counsel stated that Plaintiff is not seeking remedies for Defendants' alleged infringement of Plaintiff's Lion Head Logo through Defendants' sale of faux leather jackets (discussed at footnote 10, *supra*), but instead, is only seeking remedies for Defendants' counterfeiting activity as it relates to the men's velour track suits. (Tr. 15, 26.) Thus, Plaintiff is

seeking: (1) damages and/or Defendants' profits and prejudgment interest for the acts of counterfeiting relating to the track suits, under 15 U.S.C. §1117 (Stip. ¶¶ 76, 78; Tr. 14-15, 17-18); (2) costs and reasonable attorneys' fees, under 15 U.S.C. §1117 (Stip. ¶ 79; Tr. 23-24); and (3) an injunction with respect to the counterfeit track suits, under 15 U.S.C. §1116 (Stip. ¶ 75).

## Conclusions of Law and Analysis

### A. Jurisdiction

Federal jurisdiction exists under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction for the state law claims). (Final Pretrial Order ¶ 1.) The parties have consented to the jurisdiction of a magistrate judge. [Dkt 43, 44.] Jurisdiction is not disputed. (Final Pretrial Order ¶ 1.)

### B. The Corporate Defendants' Liability for Counterfeiting Activity

Plaintiff alleges that Defendants violated § 32 of the Lanham Act (Compl. ¶ 49), which provides, in relevant part:

> Any person who shall, without the consent of the registrant – (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a). The term "counterfeit mark" is defined as "a counterfeit of a mark that is registered on the principal register in the [PTO] for such goods or services sold, offered for sale or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered," or "a spurious designation that is identical with, or substantially

indistinguishable from, a designation as to which the remedies of this chapter are made available." *Id.* § 1116(d)(1)(B).

To prevail on a claim under this section, a plaintiff must establish that: (1) it holds a valid trademark, and that the defendants (2) used a reproduction, counterfeit, copy, or colorable imitation of a mark; (3) without the registrant's consent; (4) in commerce; (5) in connection with the sale of any goods; (6) where such use is likely to cause confusion, or to cause mistake, or to deceive. *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950 at *8 (N.D. Ill. Jan. 22, 2001) (Pallmeyer, J.) (citation omitted).

Plaintiff has met its burden. First, Plaintiff has registered its CLENCH mark, and Defendants admit that the existence of the trademark's registration placed them on constructive notice of Plaintiff's rights in the mark. (Stip. ¶¶ 8, 9, 10, 42; Sept. 23, 2003 Mem. Op. & Order at 2, 5.) That registration is "prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001) (quoting 15 U.S.C. § 1115(a)). Thus, Plaintiff's mark is presumed valid and protectable based on the undisputed evidence of registration. Moving on to the remaining elements, Plaintiff has offered unrebutted evidence that Defendants used and/or distributed a counterfeit mark. Specifically, the velour track suits that the corporate defendants purchased, imported into the U.S., and sold bore marks that were virtually identical to or substantially indistinguishable from Plaintiff's marks. (Stip. ¶¶ 16, 17, 20; Pl.'s Ex. 10 at Interrog Nos. 11, 12; Pl.'s Exs. 3-8, 13, 14, 31.) Third, Plaintiff has demonstrated that Defendants obtained the track suits without Plaintiff's consent. (Stip. ¶¶ 18, 19, 22-23, 71.) Fourth, there is no dispute concerning the corporate defendants' sale of the counterfeit goods in commerce; the evidence shows that the corporate defendants sold the goods to

at least three different retailers in various states including Georgia and Illinois. (Stip. ¶¶ 20, 57-59; Pl.'s Ex. 10 at Interrog. No. 12.)

Finally, with respect to the last element, "likelihood of confusion," seven factors are generally considered: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the complainant's mark; (6) actual confusion; and (7) the intent of the infringing party to "palm off" its product as that of the other party.[11] *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999) (citation omitted). In this case, the marks appearing on the track suits are clearly similar in appearance and suggestion to Plaintiff's marks (Stip. ¶¶ 16, 20; Pl.'s Exs. 3-8, 13, 14, 31; Sept. 23, 2003 Mem. Op. & Order at 7); the products sold by the parties are similar (Pl.'s Exs. 3-5, 30, 31; Stip. ¶¶ 2, 6, 9, 16; Sept. 23, 2003 Mem. Op. & Order at 7-8); the area and manner of the parties' usage is concurrent (Stip. ¶¶ 12, 15, 20; Sept. 23, 2003 Mem. Op. & Order at 8); there is likely little care exercised by consumers in purchasing the products (Sept. 23, 2003 Mem. Op. & Order at 8-9); the CLENCH mark is a strong trademark (*id.* at 6-7); and it appears as though Defendants did intend to palm off its product as the product of Plaintiff (*id.* at 9). Thus, Plaintiff has established the likelihood of confusion element, as well. *See Microsoft Corp. v. CMOS Tech., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J. 1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which

---

[11] While intentional infringement may lead to enhanced statutory damages, it is not required to prove a defendant's liability. 15 U.S.C. § 1117(c); *see also Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n. 6 (7th Cir. 1992) ("We note in passing that the district court did not have to find that [the defendant] was willfully blind to establish its liability. Sellers bear strict liability for violations of the Lanham Act.").

plaintiff's registered marks appear in their entirety."). As noted above, Defendants did not appear at trial to contest this evidence. Thus, the corporate defendants are liable for infringement of Plaintiff's trademarks through their sale of goods bearing counterfeit CLENCH marks in violation of the Lanham Act.

C.  **Individual Liability of Defendant Kim**

Plaintiff asserts that defendant Kim is individually liable for infringing Plaintiff's trademarks. (Tr. 21-22.) Again, Kim did not appear at trial to contest any of the evidence regarding his personal liability. The court finds that Kim is individually liable under three separate theories: vicarious liability, contributory liability, and piercing the corporate veil.

Courts have found that an individual may incur liability for a corporation's infringement under two theories: (1) vicarious liability; and (2) contributory liability. *See Logical Choice Computers*, 2001 WL 58950 at *10 (citing *Burdick v. Koerner*, 988 F. Supp. 1206, 1209 (E.D. Wis. 1998)). "An individual may be held vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Id.* (citations omitted). A party may be held contributorily liable "if he has knowledge of the infringing activity and directly participates in the infringing activity or induces, causes, or materially contributes to the infringing conduct of another." *Id.* (citations omitted). A contributory infringer is jointly and severally liable for the infringement. *Id.* (citations omitted).

The undisputed evidence demonstrates that: (1) defendant Kim was the sole shareholder/member, executive, and officer of both corporate defendants; (2) the corporate defendants failed to observe corporate formalities or maintain separate books, records and bank

accounts from those of defendant Kim; and (3) all of the substantive actions of the corporate defendants were carried out by defendant Kim. Under the legal standards discussed above, Kim is both vicariously and contributorily liable. As the sole shareholder/member, executive, and officer of both corporate defendants at all times during their existence, Kim had the right and ability to supervise the sale of the counterfeit goods, and would have had a direct financial interest in any profits resulting from the counterfeiting activity. In addition, Kim had knowledge of the counterfeiting activity and directly participated in it. Moreover, as will be discussed further below, the corporate defendants', and thus Kim's, actions amounted to willful infringement. Those facts meet the standards of vicarious and contributory liability. *See Logical Choice Computers*, 2001 WL 58950 at *10-11.

In addition, Kim is individually liable though a piercing of the corporate veil. The general rule is that a shareholder is not liable for a corporation's debts. *Browning-Ferris Ind. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 959 (7th Cir. 1999). "However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Fieldturf Intl., Inc. v. Triexe Mgmt. Group Inc.*, No. 03 C 3512, 2004 WL 866494 at *4 (N.D. Ill. April 16, 2004) (Nolan, M.J.) (quoting *Peetoom v. Swanson*, 778 N.E.2d 291, 295-96 (Ill. App. 1992)). To pierce a corporate veil under Illinois law, two requirements must be met:

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

*Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994) (quoting *Van Dorn Co.*

*v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). To determine whether there is sufficient "unity of interest and ownership," Illinois courts have considered some of the following: (1) the failure to maintain adequate corporate records or comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another as its own. *Van Dorn Co.*, 753 F.2d at 570. As discussed above, Kim did not preserve corporate formalities in managing the corporate defendants, and did not maintain separate books, records and bank accounts from those of the corporate defendants. That evidence also supports the conclusion that the corporations' funds or assets were commingled, and that Kim used the corporations' assets as his own.

Once the first part of the test is established, as it is here, the second part of the test is satisfied by demonstrating either the sanctioning of a fraud (intentional wrongdoing) or the promotion of injustice. *Id.* Although the "promote injustice" test requires less than fraud, it requries more than the prospect of an unsatisfied judgment. *Hystro Prods.*, 18 F.3d at 1390. It requires some element of unfairness. *Id.* Illinois courts have pierced the corporate veil to avoid injustice when, for example, failure to do so would unfairly enrich one of the parties, *id.* (citing *B. Kreisman & Co. v. First Arlington Natl. Bank*, 415 N.E.2d 1070 (Ill. App. 1980)), or would allow a former partner to ignore obligations, *id.* (citing *Gromer, Wittenstrom & Meyer, P.C. v. Strom*, 489 N.E.2d 370 (Ill. App. 1986)).

In this case, the court finds that Plaintiff has demonstrated that failing to pierce the corporate veil would promote injustice. Defendant Kim set up two corporations with virtually identical names that were apparently just fronts for his own activities. One of the corporations never conducted any activity. Kim used the corporate assets for his own purposes without accounting for that use. It

would be unjust to allow defendant Kim to insulate himself from personal liability by means of a corporate identity that he did not respect. In addition, Kim would be unfairly enriched (by the profits from the counterfeiting activity) if he were allowed to avoid liability in this case. Thus, Kim is individually liable through a piercing of the corporate veil, as well.

## D. Remedies

Once counterfeiting activity has been established, a plaintiff is entitled, subject to certain limitations, to recover the defendants' profits, any damages sustained by the plaintiff, and the costs of the action. 15 U.S.C. § 1117(a). A plaintiff may also be entitled to attorney's fees, *id.* § 1117(a), (b), prejudgment interest, *id.* § 1117(b), and injunctive relief, *id.* § 1116(a), as discussed below.

### 1. Damages

Under the Lanham Act, a trademark owner may elect to recover an award of statutory damages, rather than actual damages and profits, for any use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services. *See id.* § 1117(c); *Lorillard Tobacco Co. v. S & M Central Serv. Corp.*, No. 03 C 4986, 2004 WL 2534378 at *3 (N.D. Ill. Nov. 8, 2004) (Holderman, J.). At trial, Plaintiff's counsel stated that Plaintiff was seeking monetary relief in the amount of $50,000, whether that figure be calculated as Defendants' profits under § 1117(a) or statutory damages under § 1117(c). (Tr. 4, 14-15, 17-18; Stip. ¶ 76.) The court awards Plaintiff statutory damages, based on Plaintiff's election under § 1117(c).[12]

---

[12] With regard to the calculation of Defendants' profits, Plaintiff's counsel stated that Plaintiff estimated a profit of $25.00 per each of the 2,040 sets of velour track suits (which would amount to an award of $51,000). (Tr. 4, 14-15, 17-18.) Plaintiff's counsel explained that the

-15-

Under the Lanham Act, the present statutory minimum and maximum are $500 and $100,000 per counterfeit mark per type of goods or services sold for non-willful infringement, 15 U.S.C. § 1117(c)(1), and a court may award up to $1,000,000 per counterfeit mark if the plaintiff proves that the infringement was committed willfully. 15 U.S.C. § 1117(c)(2); *see also Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593 at *14 (N.D. Ill. Aug. 28, 2003) (Grady, J.). In setting an appropriate statutory damages amount, courts are not required to follow any "rigid formula," *V3 Solutions, Inc.*, 2003 WL 22038593 at *16, and have wide discretion. *Logical Choice Computers*, 2001 WL 58950 at *11 (citation omitted).[13] In the present case, Plaintiff asserts that Defendants' infringement was knowing and willful. (Tr. 19-21; Pl.'s Prop'd ¶¶ 69, 70 [dkt 52].) "Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Logical Choice Computers*, 2001 WL 58950 at *11 (citing *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511 (7th Cir. 1994)). *See also Hard Rock Café*, 955 F.2d at 1149 (stating that "willful blindness" is equivalent to actual knowledge). The unrebutted evidence demonstrates that Defendants knew that the goods bore trademarks belonging to Plaintiff at the time of purchase, importation, and sale of the goods (Stip. ¶¶ 51, 52, 61); that Defendants never performed a trademark search and did not seek the advice of counsel with respect to the marks on the counterfeit goods

---

track suits were sold by Defendants for $60.00 per garment, and the $25.00 per garment figure was "a modest request because usually the markup is 100 percent, and in the case of these items we believe it's 200 percent." (Tr. 14.) The court finds that calculation to be reasonable.

[13] Courts may consider factors such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent to future copyright infringement." *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991) (citations omitted).

(Stip. ¶¶ 53, 54); and that the corporate defendants failed to respond to Plaintiff's requests that they cease and desist their infringing activities (Stip. ¶¶ 22-24). Based on those facts, the court concludes that Defendants knowingly and willfully infringed Plaintiff's trademarks by selling goods bearing the counterfeit CLENCH marks. *See V3 Solutions, Inc.*, 2003 WL 22038593 at *15, 16 (finding willfulness based on defendants' reckless disregard for and willful blindness to plaintiff's trademark rights); *Logical Choice Computers*, 2001 WL 58950 at *10 (finding "willful blindness" even though plaintiff sent only one cease and desist letter to defendant before filing suit) (citing *Microsoft Corp. v. Compusource Distrib., Inc.*, 115 F. Supp. 2d 800, 809 (E.D. Mich. 2000)). As such, Plaintiff is entitled to a statutory damages award of up to $1,000,000. 15 U.S.C. § 1117(c).

As mentioned above, however, Plaintiff requests damages in the amount of only $50,000, regardless of how that amount is calculated (*i.e.*, whether it is calculated as actual damages and/or profits, or statutory damages).[14] Defendants have not challenged Plaintiff's request for statutory damages of $50,000. Because the counterfeiting activity was committed knowingly and willfully, and the amount requested by Plaintiff is less than Plaintiff's reasonable estimate of Defendants' profits (*see* footnote 12, *supra*), the court awards Plaintiff the amount of $50,000 in statutory damages.

---

[14] Plaintiff's counsel subsequently stated at trial that the court "could grant up to a million dollars if [it] finds that [the infringement] was willful,"(Tr. 19), and that it may be directed under § 1117(b) to order treble damages. (Tr. 24.) However, Plaintiff's counsel did not request such an amount. In fact, on the issue of treble damages, Plaintiff's counsel stated: "[W]e would not turn away from them if your Honor ordered them . . . . However, we are not trying to be overreaching in this with an individual defendant; we are simply trying to get something reasonable." (Tr. 24.) In addition, in both the parties' stipulations and Plaintiff's Proposed Findings of Fact and Conclusions of Law, Plaintiff requested statutory damages of up to $100,000, not $1,000,000. (Stip. ¶ 76; Pl.'s Prop'd ¶ 93.) Thus, the court concludes that Plaintiff has requested an award of statutory damages of not more than $100,000 and, more specifically, $50,000.

Under § 1117(b), the court "may in its discretion award prejudgment interest." Although Plaintiff's Complaint also requested prejudgment interest and the parties stipulated to the fact that Plaintiff was seeking prejudgment interest (Compl., Prayer for Relief ¶ J; Stip. ¶ 78), Plaintiff made no argument at trial or in any submissions as to why it should be awarded prejudgment interest. Because Plaintiff has not made any argument in support of its request for prejudgment interest, the request is denied.

### 2. Costs and Attorney's Fees

In addition to its request for statutory damages, Plaintiff also asks the court to award it costs and reasonable attorney's fees. (Tr. 23-25; Stip. ¶ 79; Compl. ¶ 52; Prayer for Relief ¶ G.) Under the Lanham Act, a plaintiff whose trademark has been infringed "shall be entitled" to recover costs. 15 U.S.C. § 1117(a). Thus, Plaintiff is awarded its costs.

Regarding attorney's fees, § 1117 provides that a plaintiff may be awarded attorney's fees in two circumstances: (1) if a defendant has sold counterfeit goods, attorney's fees may be awarded in "exceptional cases" (§ 1117(a)); but (2) if the violation consists of "intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," attorney's fees must be awarded unless there are "extenuating circumstances" (§ 1117(b)). Thus, if a defendant is liable because it was willfully blind or because it knew the products it was selling were counterfeit, an award of attorney's fees is mandatory under § 1117(b) absent extenuating circumstances. *See Hard Rock Café*, 955 F.2d at 1151 (stating that "[w]illful blindness is sufficient to trigger the mandatory provisions of subsection b"); *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) (stating that § 1117(b) requires a showing that the "defendant's violation involved 'knowing such mark . .

. is counterfeit,'" and that "willful blindness is knowledge enough"); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 642 (7th Cir. 2003). If, however, the defendant is liable "only because it had 'reason to know' that [the products] were counterfeits, then the district court should award attorney's fees only if it finds that the circumstances were exceptional." *Hard Rock Café*, 955 F.2d at 1151. An "exceptional case" is one in which the acts of infringement are "malicious, fraudulent, deliberate or willful." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994) (citation omitted). *See Lorillard*, 2004 WL 2534378 at *8 (awarding attorney's fees under § 1117(a) based on determination of willful infringement by defendant); *BASF Corp.*, 41 F.3d at 1099 (affirming award of attorneys' fees under § 1117(a) based on district court's conclusion that the acts complained of were deliberate).

As discussed above, the court has already found that Defendants' counterfeiting activity was deliberate and willful. Thus, this is an "exceptional case" pursuant to § 1117(a), and the court finds that Plaintiff is entitled to its reasonable attorney's fees. In addition, the court finds that Plaintiff is also entitled to its reasonable attorney's fees under § 1117(b), as Defendants acted "willfully blind," and no extenuating circumstances exist which would preclude such an award.

At the trial, Plaintiff's counsel stated that she would submit a written submission of her attorney's fees if an award of fees was granted. (Tr. 24-25.) Plaintiff's counsel is required to do so by July 25, 2005.

### 3. Injunctive Relief

Lastly, Plaintiff seeks a permanent injunction enjoining Defendants from further infringing Plaintiff's products. (Compl. ¶ 51, Prayer for Relief ¶ G.) The Lanham Act states that courts "shall

have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the [PTO]." 15 U.S.C. § 1116(a). The statute contemplates some showing by the plaintiff of a threat of future infringing conduct by the defendant. *V3 Solutions, Inc.*, 2003 WL 22038593 at *16. Both corporate defendants are either defunct or dissolved (Pl.'s Exs. 58, 59; Stip. ¶ 3), and Plaintiff has not demonstrated how Defendants are likely to continue their infringing conduct in light of this fact. Plaintiff has not demonstrated that there is a risk that defendant Kim will personally continue to infringe Plaintiff's trademarks. Thus, Plaintiff's request for an injunction is denied. *See V3 Solutions, Inc.*, 2003 WL 22038593 at *16-17 (denying injunctive relief where plaintiff failed to establish a threat of future continued infringement by defendants).

## Conclusion

For the foregoing reasons, judgment is granted in favor of Plaintiff Tony Jones Apparel, Inc. and against Defendants Indigo USA LLC, Indigo USA Ltd., and Hae Kim in the sum of $50,000 jointly and severally against all Defendants. In addition, the court finds that Plaintiff is entitled to its reasonable attorney's fees and costs. Plaintiff's counsel shall file and serve submit a written submission of her attorney's fees by July 25, 2005. Any objection to Plaintiff's fee request must be filed and served no later than August 8, 2005.

IT IS SO ORDERED AND ADJUDGED.

Geraldine Soat Brown
United States Magistrate Judge

July 11, 2005